FILED

02/13/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 6, 2016

## STATE OF TENNESSEE v. ANTONIO RICHARDSON

**Appeal from the Criminal Court for Shelby County**
**No. 14-04161     James M. Lammey, Jr., Judge**

### No. W2016-00340-CCA-R3-CD

The Defendant, Antonio Richardson, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder. *See* T.C.A. §§ 39-13-202 (2014). The trial court sentenced the Defendant to life imprisonment. On appeal, he contends that (1) the evidence is insufficient to support his conviction and (2) the trial court erred by admitting in evidence a photograph of the victim from the crime scene. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Stephen C. Bush, District Public Defender; Tony N. Brayton (on appeal), Kamilah Turner (at trial), and Jennifer Case (at trial), Assistant District Public Defenders, for the appellant, Antonio Richardson.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glen Baity and Bryce Phillips, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case arises from an August 16, 2014 shooting in which Andrew Wooten, also known as Woo, sustained multiple gunshot wounds while inside his car and died as a result of his injuries. At the trial, Teresa Wooten, the victim's sister, testified that she last saw the victim two days before the shooting. She said that she had never heard of the Defendant before the victim's death but said her daughter and the Defendant were Facebook friends around the time of the shooting. Ms. Wooten said that her daughter showed Ms. Wooten the Defendant's Facebook page. Ms. Wooten identified a photograph depicting the Defendant standing behind a black SUV and said this photograph was posted on the Defendant's

Facebook page. Ms. Wooten said that she called the police after viewing the photograph and showed the photograph to police officers. Ms. Wooten stated that in 2012, the victim was accused of shooting the Defendant, although she did not witness the shooting.

Memphis Police Lieutenant Derrick Williams testified that on July 18, 2012, he investigated a shooting incident in which the Defendant was the victim. Lieutenant Williams stated that he called the Defendant and asked what occurred and that the Defendant reported a man identified as Woo "ran in his house on him." Lieutenant Williams said that the Defendant did not want to prosecute and that the file was closed. He said that although he asked the Defendant to sign a refusal to prosecute form, no form was signed.

On cross-examination, Lieutenant Williams testified that the telephone number he used to contact the Defendant was provided to him by the officer who responded to the crime scene. He agreed he had never spoken to the Defendant before the 2012 incident.

Taylor Newton testified that he worked at Thompson Court Apartments at the time of the 2014 shooting and that he was the assistant property manager tasked with security oversight. He said that security cameras were positioned on the main office building, that the cameras recorded the shooting, and that the police obtained a copy of the recording, which was received as an exhibit. On cross-examination, Mr. Newton testified that he was unsure whether an employee of the apartment complex continuously watched the security cameras.

Memphis Police Officer James Fort testified that he obtained the surveillance video recording from the apartment complex. Although the recording was played for the jury, it is not contained in the appellate record.

Laquinta Davis testified that she lived at the apartment complex on August 16, 2014. She said that at the time of the shooting, she was on her back porch watching neighborhood children play football and that she saw a black SUV drive around the area twice before stopping near her apartment. She said that she heard gunfire and that the Defendant got out of the driver's door of the SUV, ran toward another car, and continued shooting to "finish off" the victim. She said that the gun was a semi-automatic handgun. She said that she heard a two-second pause during the shooting, which she described as the time it took for the Defendant to "get close enough . . . and then finish" shooting at the victim. She said that she heard about nine gunshots and that the Defendant returned to his SUV and drove away. She said that she called 9-1-1, that the dispatcher asked her to determine whether the victim was breathing, that she walked to the car, and that the victim was not breathing. She saw bullet holes in the victim's back and said the victim was "slumped over" to the side.

Ms. Davis identified the surveillance recording from the apartment complex and said that the recording accurately reflected her testimony. She said that although several people walked toward the victim's car after the shooting, nobody got inside the car. She said that she did not see any weapons in the victim's hands or inside the car and that she did not see anything to indicate shots were being fired from the victim's car. She said that she had never seen the Defendant before the shooting and that she did not know the victim.

On cross-examination, Ms. Davis testified that she did not know any of the people who walked toward the victim's car after the shooting, that she did not know Charles Dowdy, and that she moved to the apartment complex about one month before the shooting. She agreed that after the people walked toward the victim's car, she turned away from the victim's car and toward the main office while she spoke to the 9-1-1 dispatcher.

Laquilshay Brown testified that she had lived at the apartment complex about seven months at the time of the shooting. She said that on the day of the shooting, she and a friend were returning to her apartment. She said that from inside her friend's car, she heard gunshots and saw the Defendant drive past her friend's car while shooting a gun at someone. She said the Defendant stopped shooting, got out of his black SUV, allowed her friend to drive past the area, walked toward the victim, and continued shooting. She said that she was about ten feet from the Defendant when he allowed her friend to drive away from the area. She said the victim was inside a car when the shooting began and was slumped over when her friend drove away.

Charles Dowdy testified that he lived at the apartment complex at the time of the shooting, that he knew the victim, and that the victim's nickname was Woo. Mr. Dowdy said the victim came to his apartment around 2:00 or 3:00 p.m. before the shooting and stayed about twenty minutes. Mr. Dowdy admitted the victim bought one pound of marijuana for $1,000 and left. After he saw the victim drive away in a gold or greenish Mazda, Mr. Dowdy returned to his apartment. Mr. Dowdy said that he stepped outside his apartment again and heard gunshots. He said that although he did not see anyone shooting a gun, he saw a black SUV driving away. He said that he did not see the driver but that he knew the SUV belonged to the Defendant because it had been parked across the street from Mr. Dowdy's apartment previously.

Mr. Dowdy testified that he reviewed the surveillance recording and that he saw the Defendant's SUV leaving the crime scene. He said that in the recording, someone got out of the black SUV and walked toward the bushes. Mr. Dowdy said the person would have been able to see vehicles leaving the parking lot from the bushes.

Mr. Dowdy testified that the victim did not have a weapon when the victim came to his apartment. Mr. Dowdy admitted that he had been convicted of selling marijuana and that

he was serving a sentence on probation at the time of the trial. He agreed he provided a police statement before receiving probation and that the prosecutor in his case had not promised leniency in exchange for his testimony in the present case.

On cross-examination, Mr. Dowdy testified that he had previous drug-related convictions and a conviction for altering, falsifying, or forging an automobile title or license plate. He said the victim did not live where the shooting occurred, although he thought the victim lived at the apartment complex. He said the drug transaction occurred in the victim's car. He denied selling the victim "pills" or cocaine and placing or removing anything from the victim's pockets. Mr. Dowdy said that after the victim drove away, he heard gunshots, that he ran, that he heard additional gunshots, that he got inside his car, that he attempted to drive away, and that he saw the victim's wrecked car. Mr. Dowdy said that he stopped his car, got out, and walked to the victim's car. Mr. Dowdy said that he yelled the victim's name, that he returned to his car, that he drove away, and that he returned to his apartment.

Shelva Stafford, Shelby County Clerk's Office records custodian, testified that the Defendant was the registered owner of a black Pontiac Aztec. She identified the license plate and VIN numbers. She agreed the last three digits of the license plate number matched the last three digits of the license plate visible in the photograph identified by Ms. Wooten.

Memphis Police Officer Brandon Westrich testified that he responded to the crime scene and that the deceased victim was slumped inside the victim's car with visible gunshot wounds. He did not recall whether the doors on the victim's car were open but said nobody was inside the car. He secured the scene and said he looked for cartridge casings and other evidence in the area. He did not see any weapons inside the car but saw marijuana on the front passenger floorboard. On cross-examination, Officer Westrich stated that he saw bystanders when he arrived at the crime scene but that nobody was "directly in the crime scene."

Chief Medical Examiner Karen Chancellor, an expert in forensic pathology, testified that the victim suffered four gunshot wounds to the left shoulder, back, and head. She said that one of the bullets fractured the left clavicle, that a second bullet damaged the left lung and heart, causing internal bleeding, and that a third bullet damaged the left lung, liver, and spleen. A fourth bullet struck the victim's skull, causing a fracture, but did not injure the brain. She concluded that either the second or third bullets could have caused the victim's death because of the damage to the victim's organs. The victim's toxicology report showed the presence of marijuana. She concluded that the cause of death was multiple gunshot wounds.

On cross-examination, Dr. Chancellor testified that at the time of the autopsy, a bag containing a green leafy substance, a bottle containing pills, one bag containing a white powder, one bag of white pills, a single $100 bill, two $10 bills, seventeen $1 bills, twenty-

six $20 bills, and five $5 bills were collected from the victim's body. She did not perform any analyses on the white power.

Memphis Police Officer Jeffrey Garey testified that he collected evidence at the scene. He recovered seventeen FC nine-millimeter cartridge casings. Photographs of the victim's car showed seven "circular defects" on the rear driver's side, circular defects on the front driver's door and front fender, broken and shattered front driver's and passenger-side windows, and three circular defects in the front driver's seat. A single photograph showed the victim inside the car leaning toward the center console and front passenger seat and with three circular defects in his upper left shoulder and back. Officer Garey said that one cartridge casing was found on the hood of the victim's car and that three casings were found in "fairly close proximity" to the car. Officer Garey said no weapons or ammunition were found inside the victim's car.

Tipton County Sheriff's Detective Brandon Matlock testified that on September 17, 2014, he obtained a search warrant for the black Pontiac Aztec matching the license plate and VIN numbers previously identified. Detective Matlock said that the SUV was registered to the Defendant. Detective Matlock and Memphis Police Sergeant Gaylor and another officer searched the SUV. A photograph of the SUV's interior showed an identification badge reflecting the Defendant's name and photograph. Detective Matlock said other items were seized from the SUV, including a grey hooded sweatshirt and red and black work gloves.

Memphis Police Officer Michael Coburn testified that he processed the victim's car. He said that the circular defects were possible bullet holes and that nine circular defects were found on the rear of the driver's seat and on the front passenger seat. He said that twelve circular defects were found on the outside of the car. He said that bullet projectiles were found on the left rear floorboard and in some clothing after it was removed from the back seat. He identified two projectile fragments found on the right rear floorboard and inside the front right door handle. He identified a baseball cap found inside the car with two circular defects and said broken window glass was found inside the car. He said no cartridge casings, unfired ammunition, or weapons were found inside the car. He attempted to obtain latent fingerprints from the car, but none were found.

Officer Coburn testified that he processed the Defendant's Pontiac Aztec, that no weapons or cartridge casings were found inside the SUV, and that no circular defects were found inside or outside the SUV. He did not attempt to obtain latent fingerprints.

On cross-examination, Officer Coburn testified that the green leafy substance found inside the victim's car was later identified as marijuana, which weighed 455.8 grams. He agreed he obtained one fingerprint on the bag containing the marijuana and said the

fingerprint was forwarded to the latent fingerprint examiners. On redirect examination, he agreed that the multiple circular defects found on the victim's car were possible bullet holes and that he found no similar markings on the Defendant's SUV.

Tipton County Sheriff's Deputy Jeffrey Thompson, Sr., testified that on September 16, 2014, the United States Marshals Service apprehended the Defendant in Covington.

Memphis Police Sergeant James Sewell testified that he responded to the scene of the shooting and that the victim had clear plastic sandwich bags in his pants pocket. He said the bags were commonly used to sell drugs. He agreed he also saw an unmarked pill bottle containing several unidentified white pills. He did not see any weapons or ammunition inside the car or on the victim's body.

Brenda Lee, apartment manager and records custodian for Thompson Court Apartments, testified on behalf of the defense that the Defendant and Anthony Williams leased an apartment on January 17, 2014. She said Mr. Williams lived in the apartment on August 16, 2014.

Dominique Harris, the victim's niece and the Defendant's cousin, testified that in July 2012, the Defendant and the victim were in an altercation. She said that someone "broke up" the fight inside an apartment at Hillview Village, that the victim ran upstairs, that the victim obtained a gun, and that the victim returned with a gun and shot the Defendant. She recalled that multiple people, including children, were present and said that everyone "scattered" after the victim obtained the gun. She said the Defendant also ran because everyone knew the victim went inside to obtain a gun. She said that she and the Defendant ran downstairs, that the Defendant suffered a gunshot wound to the leg, and that the Defendant escaped through a bedroom window. She said she heard the victim say, "Man, you think it's a game," just before the gun fired twice. On cross-examination, Ms. Harris stated that she and the Defendant never spoke about the shooting and that she did not know the Defendant refused to prosecute the victim.

The Defendant testified that in 2012, the victim shot him. The Defendant explained,

[T]here was a stabbing that happened between Ms. Helen and my sister. I came back from the basketball court and I saw that, so I knew [the victim] from the park and I told him about this, I told him . . . what had happened. I came around and I asked him what happened and what was going on and he stowed off on me and hit me and we got into an altercation.

The Defendant said that after the fight, the victim ran upstairs, obtained a gun, found the Defendant, and shot him in the leg. The Defendant said that he held up his hands and asked

the victim not to shoot him. The Defendant said that the victim ran away after the shooting, that "Helen's brother" was "coming back . . . to try to finish it off," and that he and Ms. Harris escaped through a window. He said that he obtained treatment at the hospital, that he only spoke to the police at the scene before he left in an ambulance, and that he told the officer the victim shot him.

The Defendant testified that he lived at the apartment complex where the shooting in the present case occurred and that he shot the victim because he feared for his life. The Defendant said that on the day of the shooting, he returned home after driving his sister to her home and saw the victim and Mr. Dowdy standing near the Defendant's apartment. The Defendant recalled an unrelated confrontation with Mr. Dowdy the day before the shooting and said the incident related to his and Mr. Dowdy's nieces. The Defendant said he attempted to speak to Mr. Dowdy and Mr. Dowdy's father to persuade Mr. Dowdy's father to calm Mr. Dowdy. The Defendant said that when he went to talk to Mr. Dowdy's father, "they [were] already loading up, like they was fixin [sic] to get ready to come down there and shoot up my apartment." The Defendant said,

> So they saw my face and they say, they had knew me, so I guess they were . . . squashing it and stuff . . . for whatever reason like that. But, you know how it is, [Mr. Dowdy], he will say something and he got to do something else, like get somebody to try to take you out, or something like that.

The Defendant said that he thought the matter was resolved but that when he saw Mr. Dowdy and the victim the next day standing across the street from the Defendant's apartment, he was unsure what was happening. The Defendant said that he drove his SUV around the area, parked, got out, and approached Mr. Dowdy and the victim. The Defendant said that he asked the men what was happening and that the victim said, "If you don't get away from around here[,] I'm going to blow [your] a-- off." The Defendant said he returned to his SUV, thinking about the victim's shooting him previously.

The Defendant testified that he had owned the gun he used to shoot the victim since the victim shot him two years previously. He said that while he was sitting in his SUV, he thought the men were going to shoot at him and that he needed to protect himself. He said that he backed up his SUV in the event the men attempted to shoot at him first, that he got out, and that he began shooting first because he thought the victim was going to kill him. He said he did not drive away because he lived at the apartment complex and because he was shot the last time he ran from the victim. He said he did not call the police immediately after the shooting and recalled feeling "a rage." He said he did not go to his apartment because he feared "they" would hurt him.

-7-

On cross-examination, the Defendant testified that he did not speak to Lieutenant Williams about the victim's shooting him in 2012. He said that he was upset about the victim's shooting him but that he "let it go." He denied wanting "street justice." The Defendant said that Mr. Dowdy did not live in the apartment Mr. Dowdy identified and that Mr. Dowdy did not live across the street from him. The Defendant agreed that he parked his SUV behind a bush on the day of the shooting but denied he backed up to ensure the victim could not see him coming around the building. He said he was not afraid of the victim until the victim threatened him.

The Defendant agreed that he saw the victim drive around the corner, that the Defendant began firing his gun, and that no gunshots were fired from the victim's car. He did not know whether the victim had a gun but said the victim had threatened him and was driving toward him. He did not know how many shots he fired at the victim's car and said he was "in a rage." He agreed he ran to his SUV when the shooting ended. He did not know why he did not call the police after the shooting and denied knowing the police were looking for him.

The Defendant testified that he was not "waiting to get [his] chance" because he had seen the victim numerous times since the 2012 shooting. He said he used a nine-millimeter handgun to shoot the victim and said he sold it to the original owner afterward. He agreed he denied shooting the victim until he saw the surveillance recording from the apartment complex. He said later, though, that he did not know he had shot the victim until he saw the recording and that he was shocked.

On redirect examination, the Defendant testified that he had to "get" the victim before the victim "got" him. He said that he needed to shoot the victim before the victim hurt him again. He said that he took seriously the victim's threat to "blow [the Defendant's] a-- off."

Upon this evidence, the Defendant was convicted of first degree premeditated murder, and the trial court imposed a life sentence. This appeal followed.

## I. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction. He argues that the State failed to establish that he acted with premeditation, that the evidence reflects he acted pursuant to adequate provocation based upon the previous altercation with the victim, and that his conviction should be reduced to voluntary manslaughter. The State responds that the evidence sufficiently showed that the Defendant acted with premeditation and that he did not act pursuant to adequate provocation. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

First degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1) (2014). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); *see* T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the conscious objective or desire to engage in the conduct or cause the result"). "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." T.C.A. § 39-13-202(d) (2014). "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). As a result, the jury "may infer premeditation from the manner and circumstances of the killing." *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *see State v. Vaughn*, 279 S.W.3d 584, 595 (Tenn. Crim. App. 2008). Our supreme court has provided a list of factors which "tend to support the existence" of premeditation and deliberation. *See Bland*, 958 S.W.2d at 660. The list includes the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Id.* (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1997)).

We conclude that the evidence is sufficient to support the Defendant's conviction. The evidence viewed in the light most favorable to the State reflects that on the day of the shooting, the Defendant arrived at the apartment complex in his black SUV, drove around

the area twice before parking, that he got out of his SUV, that he grabbed a nine-millimeter handgun from inside his SUV, that he began shooting at the victim's car when it drove near the Defendant, that he walked toward the victim's car, that he stopped shooting to allow a car to drive past the area, and that he continued shooting until he had fired his handgun seventeen times. The victim was driving his car when the shooting began, and he was struck four times. The medical examiner testified that the cause of death was gunshot wounds. Photographs taken at the crime scene show the victim was shot three times in the rear shoulder and back areas. After the shooting, the Defendant ran to his SUV and drove away. We note that the Defendant fled the county and was apprehended approximately one month after the shooting. The victim was unarmed, and the Defendant admitted no shots were fired from the victim's car. The Defendant also admitted parking his SUV behind a bush and to selling the handgun used during the shooting to the original owner. Based upon this evidence, a reasonable jury could conclude beyond a reasonable doubt that the Defendant committed first degree premeditated murder. The jury's verdict reflects that it rejected the Defendant's testimony that he acted in an effort to defend himself or "in a rage" and any conflicts in the evidence and witness credibility were resolved by the jury in favor of the State. The evidence is sufficient to support the conviction.

Relative to the Defendant's argument that the evidence supports a finding that he acted based upon a state of passion produced by adequate provocation because he feared the victim due to the 2012 incident in which the victim shot the Defendant in the leg and because the victim threatened him on the day of the shooting, no evidence reflects that the victim's conduct on the day of the shooting in this case produced adequate provocation for the Defendant to shoot the victim seventeen times. The victim was driving his car without regard for the Defendant, was unarmed, and did not attempt to injure or harm the Defendant. Likewise, no evidence shows that the victim created an imminent danger of death or serious bodily injury justifying the Defendant's shooting at the victim. Any confrontation between the victim and the Defendant ended when the Defendant returned to his SUV after speaking with Mr. Dowdy and the victim. We note that the trial court's final jury instructions reflect the court provided the jury with a voluntary manslaughter instruction as a lesser included offense of first degree murder and with a self-defense instruction, which the jury by its verdict rejected. The Defendant is not entitled to relief on this basis.

## II. Photograph Evidence

The Defendant contends that the trial court erred by admitting a photograph of the victim in the driver's seat of the car in which he died. He argues that the photograph was overly gruesome and was irrelevant because the defense never disputed that the victim was driving the car when he was shot. He also argues that the photograph was not an accurate photograph of the position of the victim inside the car because the photograph was taken

after treatment from paramedics and because the State conceded the victim might have been moved before the photograph. The State responds that the trial court did not abuse its discretion by admitting the photograph. We agree with the State.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006).

Photographs of victims "are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *State v. Banks*, 564 S.W.2d 947, 950-51 (Tenn. 1978). When determining the admissibility of such evidence, the trial court should consider

> their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

*Id*. at 951. Unfair prejudice results when there is "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Dotson*, 450 S.W.3d 1, 91 (Tenn. 2014) (quoting *Banks*, 564 S.W.2d at 950-51).

The Defendant challenges the admissibility of a single photograph showing the victim "slumped over" inside his car. The photograph depicts the front passenger compartment of the victim's car, the victim's leaning toward the center console and front passenger seat, and three bullet wounds to the victim's left rear shoulder and upper back areas. The victim's head and face are not visible, but the photograph shows some blood on the victim's undershirt. The bullet wounds do not appear to be bleeding, although a small amount of blood is visible around the wounds. A blue blanket placed by first responders is covering a portion of the victim's body.

At a jury-out hearing, the defense objected pursuant to Tennessee Rule of Evidence 403 to the admission of two photographs depicting the victim inside the car at the crime scene. Trial counsel argued that the photographs were gruesome and had no probative value based upon the medical examiner's testimony that the gunshot wounds were the cause of death. The State withdrew one of the photographs and did not introduce it at the trial. The State argued that the remaining photograph at issue was relevant and that the prejudicial effect did not substantially outweigh the probative value. The prosecutor stated that she wanted to show the location of the victim's body, that he died almost immediately before police officers arrived on the scene, and that the victim did not have a gun. The prosecutor stated that no testimony showed the victim had been moved from the driver's seat, although first responders might have touched the victim's body.

The trial court found that the photograph was relevant to showing the victim's body in relation to the driver's seat and the manner in which the victim's body was slumped toward the passenger seat. The court noted that the photograph did not depict a weapon in the victim's car. The court also found that the probative value was not substantially outweighed by the danger of unfair prejudice to the Defendant. The court noted that the relevant photograph was not "as bad" as the autopsy photograph admitted without objection from the defense. The transcript reflects that the photograph was admitted during Officer Garey's testimony. Officer Garey's testimony regarding the photograph was limited to his stating that the photograph showed the victim's sitting in the driver's seat, the victim's leaning toward the right, and three circular defects in the victim's "left shoulder down to the left back portion."

We conclude that the trial court did not err by admitting the photograph. The photograph clearly showed the victim's location inside the car after the shooting, and although the victim might have received treatment by first responders while sitting in the driver's seat of the car, no evidence reflects that the victim was removed from the car before the photograph was taken. Ms. Davis testified that she determined that the victim was not breathing when she was talking to the 9-1-1 dispatcher, and Officer Westrich testified that the victim was deceased when he arrived at the scene. The photograph assisted the jury in determining whether the Defendant acted with premeditation or whether he acted pursuant to adequate provocation as he contended during his trial testimony. The photograph reflects that the victim was shot three times in the rear shoulder and upper back areas while inside his car and does not reflect the presence of a weapon, which supported witness testimony. Likewise, the photograph was not overly gruesome, although some blood was visible, and the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the Defendant's

conviction.


                                       _____

                                       ROBERT H. MONTGOMERY, JR., JUDGE